McCommon *v.* Johnson, Appellant.

582

Argued May 7, 1936:

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Louis J. Wiesen,* with him *Joseph W. Nelson, L. R. Rickard, J. A. Stranahan, Jr., W. G. Barker, Ira B. McNeal, Glen R. Law, J. W. McWilliams, John J. Donaldson, T. C. Whiteman, W. C. Pettit, Thos. H. Armstrong, Benj. Jarrett, Myron W. Jones, Emrys G. Francis, R. M. Gilkey* and *John V. Wherry,* for appellant.

*T. C. Cochran,* for appellee.

OPINION BY JAMES, J., October 6, 1936:

Plaintiff brought suit in trespass against the defendant, an attorney, to recover damages for alleged false representations by reason of which on January 19, 1914, she executed a quit claim deed of her dower interest in certain real estate. Suit was instituted on November 28, 1919 and the case tried on November 18, 1920 resulting in a verdict for plaintiff for the sum of $1,342.69 with interest from January 19, 1914. The record shows that on November 20, 1920, only a motion for judgment n. o. v. was filed; while in the typewritten motion asking that the evidence be certified and filed appears a written notation "for a new trial or." The record shows that the motion was argued on January 17, 1921, but owing to the papers being mislaid an opinion was not filed until December 30, 1935, which opinion dismissed the motions for a new trial and judgment n. o. v. In its opinion, the court regarded

the motion for a new trial as having been properly made, although no specific reasons had been assigned, and examined the record for such errors as would justify the granting of a new trial and found none. All of defendant's points, except the point requesting binding instructions, had been affirmed at the trial. From the judgment entered on the verdict, defendant appealed to the Supreme Court, which appeal was later remitted to this court. Attached to the record sent to this court was a certificate by the then president judge. A motion to quash was made by the plaintiff. Pending the disposition of the motion to quash, the defendant filed a petition in this court in which it alleged that the record as certified to this court did not contain a certificate by the trial judge or by the official stenographer of the notes of testimony or the charge of the court, and an order was made by this court directing that the record be sent back to the Court of Common Pleas of Mercer County for such proceedings as might be appropriate. Testimony was taken before the president judge, from which it appears that the official stenographer had died on August 9, 1921, defendant's trial counsel had also died and the trial judge's term had expired on the first Monday of January, 1936. Diligent search was made for the original notes of the stenographer and the original copy, but they were unable to be found. A carbon copy was used by the trial judge in writing his opinion and is printed as part of the record of this appeal. Plaintiff does not question that the record as filed on this appeal correctly represents what occurred at the trial. Nor is it contended that any exhibits have been incorrectly printed. Undoubtedly, this record is not in compliance with the Act of May 11, 1911, P. L. 279, §4, but the failure to obtain the proper certificates cannot be laid at the door of defendant. Every effort has been made by him to produce the entire record and the record as

sent to this court has not been questioned. Under these circumstances, the motion to quash should not prevail: *Waugaman v. Henry,* 75 Pa. Superior Ct. 94.

The first question submitted by defendant is that the court erred in refusing to enter judgment n. o. v. On a motion for judgment n. o. v., the testimony should not only be read in the light most advantageous to the plaintiff all conflicts therein being resolved in her favor, but she must be given the benefit of every fact and inference of fact pertaining to the issue involved which may reasonably be deduced from the evidence.

Briefly stated the important facts are: Perry A. Uber died testate on February 12, 1909 seized of two dwellings in Sharon, Pa. and was survived by his widow, the plaintiff, and six children. Defendant as decedent's executor, on April 17, 1909, sold the real estate at public sale to Frank Routman subject to the dower interest of the widow who elected to take against her husband's will. On August 4, 1909, the widow, by other counsel, filed a bill in equity against Routman for an accounting and a partition of her dower interest, to which a demurrer was filed. By reason of certain delays, unimportant here, a decision on the demurrer was not filed until January 12, 1914. Counsel for the widow, on account of ill health, had been absent from June 1912 to May 1914, with the exception of from September 6, 1913 to November 4, 1913 during which time plaintiff consulted with him. Sometime in December defendant contacted Sheridan Uber, a half-brother of the decedent, and requested him to bring plaintiff to defendant's office at Mercer, which he did the early part of January 1914. For the efforts made by Sheridan Uber, he was allowed a credit of $20 upon a debt he owed defendant. On January 8, 1914, defendant wrote a letter to plaintiff enclosing a quit claim deed to Frank Routman for her interest in the premises which would net her about $1,000 after

paying defendant's fees, costs, and Routman's attorney. On January 19, 1914, plaintiff and her husband, H. B. McCommon, and Sheridan Uber came to defendant's office. Accompanied by defendant, all the parties went to the courthouse at Mercer, Pa., to see if a decision had been handed down in the equity case. Plaintiff and her husband remained in the corridor while defendant and Uber went into the prothonotary's office. Defendant then examined a book and told Uber that the case had been decided against the plaintiff. They returned to the corridor where defendant stated to plaintiff that the case had been decided against her, but that if she "would settle right away before Routman finds out," she could still get the $1,000. Both Uber and plaintiff's husband then advised plaintiff to take the amount and settle. The deed was executed by plaintiff and her husband, both signed the discontinuance docket and plaintiff received defendant's personal check for $1,000. Plaintiff stated that she would not have executed the deed if defendant had not represented the decision in the equity case had been against her. The following day she learned that her case had been decided in her favor. We are not unmindful that defendant's testimony was in direct contradiction of those facts from which fraud could be inferred and that the price she received was inadequate, but the credibility of the parties was a question for the jury. If plaintiff's testimony was to be believed, she parted with her dower interest on the strength of the false representations for less than its true value and this was properly a question for the jury.

Under the second and third questions raised by defendant, which relate to errors in the charge of the court, plaintiff earnestly and ably argues that they should not be considered because the charge of the court and the points and answers thereto were never made part of the record and that the reasons for a new trial

were not filed in the court below. We have already adverted to the failure of the stenographer to attach the certificate to the transcript of the testimony and the charge of the court, and need not further discuss it. The court below fully considered the motion for a new trial although no specific reasons were assigned and we have concluded, in view of the many unusual circumstances that this record presents, to pass upon the reasons assigned for a new trial.

The second question relates to the refusal of the trial judge to permit defendant to prove his general reputation among the members of the Bar of Mercer County for being an upright, honorable, truthful and faithful practitioner. This question is fully answered in the opinion of Justice CLARK in *Insurance Co. v. Hazen,* 110 Pa. 530, 537, 1 A. 605, as follows: "...... It seems to be well settled in Pennsylvania that in civil cases, evidence of general character is not admissible, unless from the nature of the action character is directly drawn in issue, as in libel or slander and seduction. Putting character in issue, as was said in *Porter v. Seiler,* 11 Harris 424, is a technical expression which does not signify merely that personal reputation is incidently involved in the consequences or results of the action, but that the action in its nature directly involves the question of character.

"In *Nash v. Gilkeson,* 5 S. and R. 352, evidence of the defendant's good character was rejected although actual fraud was imputed to him in the evidence of the plaintiff; and in *Anderson v. Long,* 10 S. and R. 54, the plaintiff was refused permission to show good character although the defendant set up his fraud by way of defence. In *Porter v. Seiler,* 11 Harris 424, an action of trespass was brought to recover damages for an injury wilfully inflicted with a knife, and evidence of the defendant's good character, as a peaceable man was excluded when offered for the purpose of rebutting

malice. So in *Zitzer v. Merkel,* 12 Harris 408, it was held that evidence of the defendant's good character was inadmissible in an action on the case for seduction.

"In *Porter v. Seiler,* supra, the authorities are carefully collected, and the whole subject elaborately considered, and we deem it unnecessary, on that account, to enter into any extended discussion of the question here. The rule may be considered as settled under our decisions, that in civil suits evidence of character is not admissible except where it is directly in issue, and when from the nature of the issues such evidence is of special importance; whether the act charged as complained of be indictable or not is not material. Here the company set up by way of defence, that the plaintiffs or some of them wilfully caused the fire which occasioned the loss, and although a verdict in favor of the company on that ground might affect the character of the plaintiffs, yet their character was in no proper sense put in issue.

"The plaintiff's good reputation for honesty, peace and good order would undoubtedly have been the legitimate subject of proof in their favor, upon the trial of an indictment, but it will not avail them in the trial of an action in enforcement of the contract of insurance, even though the defendants, by their plea, may charge upon them the perpetration of the same crime to relieve themselves from liability." In *Rosen v. Lis,* 88 Pa. Superior Ct. 84, former President Judge PORTER, said: "The plaintiff had not attempted a direct attack on the reputation of the defendant, nor had there been an indirect attack by the introduction of evidence, nor by slurs and insinuations thrown into the jury box by abuse of cross-examination of the defendant. There must first be an attack on the reputation before evidence as to the general reputation of a witness is admissible. When there is not such an attack and there has not been an abuse of the right to cross-examine, and the action does not in its nature directly involve the question of

character, as in libel or slander, evidence of good reputation is not admissible, under the rule in Pennsylvania: *Insurance Company v. Hazen,* 110 Pa. 530; *Talley v. Talley,* 29 Pa. Superior Ct. 535." As this record does not present a direct or indirect attack upon the reputation of the defendant, the testimony was properly rejected.

Under the third question error is alleged in the charge of the court in relation to the value and use of the Carlisle Tables in estimating the valuation of plaintiff's dower interest in the one third part of the real estate for the term of her life. Defendant urges that it is the duty of the court to fix a life interest as being one third of the fee. "In determining the present value of a life estate, the English rule was to consider the estate for life as equal in value to one third of the whole, and this rule has been adopted in some of the cases in this country [referring entirely to Pennsylvania cases which we shall hereinafter discuss]. The general rule, however, is to calculate the value according to probable duration of the life estate, based upon the tables of life expectancy, but taking into consideration the habits, physical appearance, constitution, and state of health of the life tenant and the other circumstances of the particular case": 21 C. J. 943, §75. See also 17 R. C. L. 644, §35. In *Dennison's Appeal,* 1 Pa. 201, where the one third rule was adopted in estimating the value of the life estate, the court said, "We see no objection to adopting this rule in the present case .. ...." In *Shippen's and Robbin's Appeal,* 80 Pa. 391, it was held that the Carlisle Tables are not authoritative in a judicial investigation of the value of a life estate; in such investigation each case must depend on its own circumstances, and the court further said, "We are, therefore, disposed to take the old common-law rule of one-third of the whole sum, as the present value of the accumulated interest for the life of Clayton T. Platt."

It was stated in *Datesman's Appeal*, 127 Pa. 348, 359, 17 A. 1086: "There were two modes of disposing of the fund, either of which would be allowable. One was to invest the fund until with its accumulated interest it would amount to $14,000, the sum which the property brought at the sheriff's sale, after which the life-tenant would have been entitled to the interest on the fund for life; the other was to value the life interest, give the tenant thereof his share in cash, and divide the rest between the two remaindermen. The court adopted the latter principle, and followed the old common law rule in force in England, and recognized in this state in *Dennison's App.*, 1 Pa. 201, and in *Shippen's App.*, 80 Pa. 391, that one third of the capital sum is the measure of the life interest ...... We see no error in this." In *Bacon's Estate*, 202 Pa. 535, 554, 52 A. 135, the late Justice SIMPSON—then acting as an auditor whose report was approved—said: "Under these circumstances the auditor is of opinion that the more sensible and equitable method of distribution would be to treat the life estate as equal to one third of the fund which would otherwise be held for life, and the remainder estate as equal to two thirds thereof." The court said in *Pittsburgh, Virginia & Charleston Rwy. Co. v. Bentley*, 88 Pa. 178: "Hence it was proper for the court to lay down a rule as to the valuation of the life-estate in this case as an independent interest entitled to damages. We cannot say that the net annual value of the premises multiplied by the years the life-tenant's expectancy of life, and reduced by calculation to a present cash value is an incorrect mode of determining the value of the life-estate as compared with the value of the remainder in fee." In *Boswell's Appeal*, 3 Penny. 305, a valuation of annuity at the life tenant's age was approved. From these cases, we cannot find that in estimating the value of a life estate, a fixed rule has been adopted by our courts. Each case must be determined upon its own

facts with the end in view of arriving at an equitable
and just valuation. At no point in the trial do we find
that the rule of valuation, as adopted by the trial judge,
was excepted to by the defendant, but on the contrary,
testimony introduced by defendant as to the value of
the dower interest was on the theory of life expectancy.
When a case has been tried, submitted and decided upon
a certain theory, it is too late to advance another which
might have been, but was not, put forward at the trial:
*Weiskircher v. Connelly*, 256 Pa. 387, 100 A. 965.

Plaintiff offered in evidence a 1913 Edition of the
Carlisle Tables to show the probable expectancy of her
life and the only question raised by defendant's counsel
as to its admissibility was whether it was the latest edi-
tion, as he stated he would have to use some such table.
The table showed that the probable expectancy of life of
a person 52 years of age—the age of the plaintiff at the
time of the settlement—was 19.68 years. The only evi-
dence offered by plaintiff as to the station and circum-
stances in her life was to the effect that she was born
on September 25, 1861; with her present marriage, had
been married four times, bearing five children by her
first husband and one child by her third; at the time
of trial, her husband was a farmer and she performed
the usual duties of a farmer's wife, such as making of
garden, milking the cows, making butter and perform-
ing other farm duties. Defendant's testimony was to
the effect that at the time of the settlement, plaintiff
had said that her health was poor and she was under
doctor's care, had a bad case of heart trouble and
"might not live over night." The only reference made
by the court in its charge, as to the use which the jury
would make of the tables, is as follows: "For the pur-
pose of assisting you in determining the number of
years the plaintiff may have lived you have evidence as
to her age and tables showing that at the age of 52 years
the expectancy of life is 19.68 years. You will consider

this with the other evidence as to her physical condition." The use to which mortality tables are to be applied has, in the recent cases of *McGuffey v. Schwartz,* 285 Pa. 561, 132 A. 810; *DiPietro v. Great A. & P. Tea Co.,* 315 Pa. 209, 173 A. 165, been thoroughly discussed. The factors necessary to be proved as a condition precedent to the admission of the tables and the careful and comprehensive instructions which the court should give concerning their use are both lacking in this case. However, these factors and instructions are given in order that the jury might not accept the tables as a constant and exclusive guide; and as this record is presented to us at this late date, the plaintiff has lived beyond the probable expectancy of life as fixed by the tables, almost three years. As applicable to defendant, any inadequacy of the charge has been cured by the lapse of time. Instead of plaintiff having a probable expectancy of 19.68 years, she has actually lived three years beyond and has an additional probable expectancy of six years. It would be unfair to grant a new trial over the objections of the plaintiff when the result will be to permit the jury to render an even larger verdict than was rendered. Under these circumstances a new trial should be refused.

It is to be deplored that this case has not been more speedily disposed of, but the delay cannot be attributed to the defendant, and, therefore, we have given careful consideration to every reason assigned by him on this appeal, but we must also not lose sight of the fact that the delay cannot be placed at the door of the plaintiff.

In our examination of the record, we find no such error as would justify a reversal and, therefore, the assignments of error are overruled and the judgment is affirmed.